IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2016

**YOUNG BOK SONG, AKA MIKE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2003-C-1792     Steve R. Dozier, Judge**
_____

**No. M2015-02317-CCA-R3-ECN – Filed May 17, 2017**
_____

Petitioner, Young Bok Song, filed a petition for writ of error coram nobis concerning his multiple convictions for rape of a child and aggravated sexual battery and his sixty-five-year sentence.  The petition was dismissed without an evidentiary hearing, and Petitioner appeals. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

David M. Hopkins, Murfreesboro, Tennessee, for the appellant, Young Bok Song.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; and Glenn Funk, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.      **Background**

The factual basis for Petitioner's convictions was summarized by this court, as follows:

The victim, S.L., born on September 8, 1989, and fourteen years old at the time of the trial, testified that she lived with her mother, Chong Suk Pak, and her younger sister, victim J.L., in a two-bedroom apartment in Nashville during the times the defendant had sexual contact with her.  She testified that she did not know or have any memories of her biological father. S.L. said she met the defendant when she was very young and remembered him living with her family "for a little bit."   After the

defendant moved out to live with his ex-wife and children, S.L. visited him at his house a "couple of times a week," but also continued to see the defendant at her apartment because he often babysat S.L and J.L. while their mother was at work.

S.L. testified to a number of different sexual encounters with the defendant. S.L. said the first time she remembered the defendant having sexual contact with her was when she was about eight years old and her mother was at work. She said she was in her bedroom practicing her flute and her sister was in the living room when the defendant came into the room and "told [her] to take off [her] clothes." After taking off all her clothes, S.L. closed her eyes at the direction of the defendant and laid down on her back on the bed while his "penis went inside [her] vagina." S.L. said this hurt and she began to cry, but the defendant "told [her] to be quiet." S.L. said that "[a]fter [the defendant] finished, [he] told [her] to go wash [herself]," which she did. She said she did not yell for her sister because she was afraid of the defendant. S.L. could not remember how many times the defendant had raped her in her bedroom but said it happened more than twice.

The second incident occurred when S.L. was again in her bedroom practicing her flute and the defendant told her sister and his own daughter, Mindy, to go outside and play. S.L. did not remember how old she was at the time of this encounter. She said the defendant came into her room and told her to take off her clothes and then "put his penis into [her] vagina" while she was lying on her bed. She did not recall how long this episode lasted, nor did she remember if the defendant said anything.

The third sexual encounter occurred in her living room while S.L.'s mother was at work and her sister was asleep in the bedroom. She said the defendant told her to take off her clothes, and he then "[p]ut his penis inside [her] vagina" while she laid on the floor on her back. Asked if she ever said anything to the defendant when he told her to remove her clothes, S.L. said she "sometimes . . . said that [she] didn't want to do it," but he "still did it." S.L. said she felt pain during the rape and cried, but the defendant told her to be quiet. Asked how she knew her mother was at work, S.L. said that the defendant called her mother "before . . . to make sure that she was still there." S.L. said she had her eyes closed the entire time and did not know if the defendant had anything on his penis while he was raping her. S.L. could not remember how many times the defendant raped her in the living room but said it was more than once.

- 2 -

The fourth sexual encounter happened when S.L. was twelve years old and the defendant told her to go to her mother's bedroom. S.L. said the defendant "had a towel and he put it behind [S.L's] butt, and he told [her] to take off [her] clothes and stuff." The defendant then "put his penis inside [S.L's] vagina," which was "painful" and "made [her] bleed." Asked if the defendant did anything different compared to the other times he raped her, S.L. explained that "he did it more harder." Afterward, the defendant picked S.L. up and took her into the bathroom, put her in the bathtub, and told her to wash herself. S.L. said she continued to bleed the next day at school and used tissue to keep the blood from going anywhere. S.L. testified that this was the last time the defendant put his penis inside her vagina.

The fifth encounter S.L. recalled having with the defendant was at his house. She said he told her to take off her clothes and "help him scrub his back in the shower." S.L. could not remember what happened after she took off her clothes. The sixth encounter with the defendant occurred in the living room of S.L.'s apartment when the defendant, lying on the floor, told S.L. to "perform oral sex." S.L. said the defendant put "[h]is penis inside [her] mouth," and she "was sort of choking" because the defendant "was making [her] gag" as his penis "was going really deep" in her mouth. Afterwards, the defendant told S.L. to brush her teeth. S.L. testified that the defendant made her perform oral sex on him again in her bathroom while her mother, sister, and cousin were all home. She said he turned on the faucet and made her get on her knees and put his penis in her mouth. S.L. said the defendant made her gag because "[h]e was kind of pushing [his penis] really deep down in [her] throat or something."

In addition to these sexual encounters, S.L. described incidents when the defendant touched her breasts and buttocks. She explained that he squeezed her breasts and buttocks under her clothes on other occasions separate from the ones earlier described. S.L. said the defendant told her while squeezing her breasts that she "should be thanking him because it was making [her breasts] grow."

S.L. testified that the first person she talked to about what the defendant did to her was a friend at school. She said she told her friend after attending a school program that dealt with rape and hearing from a girl "talking about how she got raped." The friend told her teacher, Ms. Griffith, whom S.L. later talked to about the sexual encounters. S.L. said

she did not tell anyone what happened to her before this because she was afraid of the defendant as a result of his hitting her and J.L. when they did not listen to their mother or do their school work. She explained that it was the defendant, not her mother, who disciplined her.

J.L., born October 31, 1990, and thirteen years old at the time of trial, testified that she did not remember how old she was when she first met the defendant but thought she was either in the first or second grade. She said she went to the defendant's house once or twice a month, and the defendant visited or babysat her and S.L. at their apartment while their mother worked. Asked if S.L. ever told her what happened with the defendant, J.L. said S.L. told her that he "raped" her in the living room. J.L. later told their mother what happened, and she "almost fainted." Asked if anything happened between her and the defendant, J.L. said when she was twelve he touched and squeezed her breast while she was in the bathroom of her apartment. She said the touching lasted a couple of seconds and made her a "little nervous." J.L. told S.L. about what had happened after S.L. confided in J.L. about what the defendant had done to her.

J.L. testified that the defendant disciplined her and S.L. and was more strict with them than their mother. She explained that he would strike them on the hands or the back of their legs with a metal stick. She said she never told her mother about the defendant hitting her because she was scared.

The victims' mother, Chong Suk Pak, who moved to the United States from Korea in 1985, testified through an interpreter. She divorced the victims' father in 1994 and he moved back to Korea sometime after that. Pak met the defendant in 1994 and he lived with her and the victims from May 1994 until March 1995, sleeping in her bedroom while she slept on the couch. Pak acknowledged having a romantic relationship with the defendant and said she did not know he had an ex-wife and children in Korea until after he began living with her. She said he told her that he was divorced. After the defendant's ex-wife and children moved to the United States in 1995, he lived with them but continued to come to Pak's apartment to babysit the victims. Pak acknowledged she continued her romantic relationship with the defendant until he moved to Alabama in 2002.

Pak said she allowed the defendant to babysit her children because she did not "trust anybody else, anyone else, to have [her] children's well-being." She "could not trust [her] ex-husband, but [she] trusted [the defendant]" with her children. Asked why she did not trust her ex-husband with the girls, Pak testified that "he often mention[ed] about sexual abuse of a father of their children; and, so, I just thought he . . . could not be trusted." She later explained that her ex-husband "watched TV and read . . . newspaper article about sexual abuse by parents, he . . . mentioned about those. So, when I heard him mentioning that, I began to doubt." She acknowledged that she did not know if her ex-husband had ever abused her children and the last time he saw the children was in 1993, when S.L. was four years old.

Pak testified that the defendant helped S.L. and J.L. with their homework and taught them music. Asked if she had seen the defendant strike her children, Pak answered that he "frequently" did so and described an incident when the defendant hit S.L. on the back of her leg with a stick. She acknowledged that striking children with a stick on their feet or back of their legs is typical punishment in Korea. Asked if she had ever questioned her daughters as to whether anything had happened to them while they were at the defendant's home, Pak answered, "I ask them if he didn't do anything. I ask that, because he is not their real father." She testified that S.L. never told her about the defendant's abuse, that she learned about it from J.L., and that the news was a shock to her. Pak acknowledged that, after the defendant moved away, she often told her daughters that if they did not behave he would come back to discipline them.

Brenda Griffith, a teacher at John Trotwood Moore Middle School, testified that in May 2003, her class had just finished sex education classes. She said representatives from Mercy Ministries talked to the class and acknowledged one of the speakers was a young girl who talked about being sexually abused but had not described the abuse in graphic detail. About a week later, representatives from the Rape and Sexual Abuse Center came to talk to her class, and soon after their presentation, S.L. told Griffith she had "been raped on numerous occasions, by a friend of her mother's." Griffith said S.L. seemed "very agitated and very nervous" and "upset" at the time. Dr. Angela Latrice McShepard Carr, a former guidance counselor at John Trotwood Moore Middle School, testified that Ms. Griffith reported S.L.'s abuse to her and that she spoke with S.L. about what had happened with the defendant. On cross-examination, Dr. Carr could not recall if S.L. used the

word "raped" when she talked to her. She acknowledged that S.L. did not describe the abuse in detail.

Dr. Maureen Sanger, a psychologist with Our Kids Center in Nashville, testified that she interviewed S.L. in June 2003 at the Center, which performs medical evaluations of children suspected of being victims of sexual abuse. The interview included S.L.'s medical history, which Dr. Sanger read to the jury. S.L. told Dr. Sanger that no one other than the defendant had ever touched her sexually, and she denied ever having any "peer sexual contact." On cross-examination, Dr. Sanger acknowledged that "[y]oung children oftentimes don't have clear memories that they're able to report verbally."

Carolyn Smeltzer, a nurse practitioner at Our Kids Center, testified that she performed a physical examination on S.L. Smeltzer explained that S.L. "had basically two areas on her hymen that . . . lacked any hymenal tissue" which "had to have been caused by some sort of a penetrating trauma, . . . something penetrated through her hymen and tore her hymen in both of those spots, all the way down to the base." Asked what could cause such an injury, Nurse Smeltzer said, "[W]hen we see kids with injuries to their hymen, that are talking about sexual abuse, they're typically talking about penile penetration to their . . . vaginal or genital area." Smeltzer acknowledged that such injuries can be the result of "an accidental penetrating injury, like a . . . straddle injury." Nurse Smeltzer testified that there is a difference in the depth of a child's hymen and explained that S.L.'s was "difficult to examine . . . because of the depth of her hymen; it was fairly in-deep inside." Smeltzer said the injury to S.L.'s hymen would have taken approximately one week to heal, and she could not say when the injury took place. Asked if the injury could have taken place when S.L. was four or younger, Smeltzer said, "There's no way to be absolutely certain[,] but this is not-the pattern of injury is not something that we commonly see in a young child." She further explained that when a younger child is sexually penetrated, "it's typically a fairly large injury . . . [the children] really come out with almost no hymenal tissue in a good part of the posterior pole."

Edward Stotts, a case manager for the Department of Children's Services ("DCS"), investigated S.L.'s allegation of sexual abuse by the defendant. Stotts told S.L. that she would be going to the Child Advocacy Center for a forensic interview and explained that a forensic interview is "basically an interview that's conducted for legal purposes." Stotts said

that S.L.'s forensic interview was tape-recorded. Stotts did not participate in S.L.'s interview but did interview J.L. who told him that the defendant had touched her breast. He said no medical examination was performed on J.L. because "there wasn't a disclosure of any type of penetration" with her.

On cross-examination, Stotts acknowledged setting up the forensic interview for S.L. after she told him she had been raped, but without receiving any details about the actual abuse. Regarding the taped forensic interview, Stotts acknowledged that S.L. was not admonished to tell the truth but did not know why.

Detective Brett Gipson, with the Metro-Nashville Police Department Sex Crimes Unit, testified that he talked to S.L. "one or two times" but did not talk to J.L. because the DCS conducted the interviewing at the Child Advocacy Center. He said the defendant was eventually located in North Carolina where he was arrested.

Mindy Song, the defendant's daughter and twelve years old at the time of trial, testified that she had visited the victims' apartment but could not recall the defendant ever telling her and J.L. to play outside by themselves. She said she was sure about this because the defendant kept a very close eye on her to make sure she stayed safe.

The defendant testified that he came to the United States from Korea in December 1994, leaving behind his pregnant ex-wife and daughter. He said he met the victims' mother in Nashville and began living with her, acknowledging they were "lovers." He described his relationship with S.L. and J.L. as an "uncle" or "father" and said the victims' mother asked him to be the disciplinarian of the girls. He acknowledged the victims were afraid of him because he "had to use some corporal punishment and sometimes cry out, I'm yelling; sometimes give them some angry eyes," but when he was not disciplining them, they "were very close . . . just a father and daughters." The defendant denied sexually abusing S.L. and J.L. and maintained that the victims had lied, explaining, "If I do one sex with the children, her inside vagina will tore down."

*State v. Young Bok Song, a/k/a Mike*, No. M2004-02885-CCA-R3-CD, 2005 WL 2978972, at *1-5 (Tenn. Crim. App. Nov. 4, 2005) (footnotes omitted).

On direct appeal, Petitioner argued that "the trial court erred in denying his motion to appoint a Korean interpreter because of his inability to intelligently express himself in

English." *Id.* at *5. This court affirmed the trial court's denial, holding that "a review of the defendant's trial testimony reveals that he speaks English quite well and, we believe, was able to effectively communicate to the jury." *Id.* at *7. This court noted that "[t]he trial court, from its unique position of observing the defendant while he testified, concluded it saw 'nothing that transpired during the trial that would lead [the trial court] to believe [the defendant] needed an interpreter.'" *Id.*

Petitioner filed a petition for post-conviction relief, arguing that "trial counsel was ineffective for failing to retain an interpreter." *Young Bok Song v. State*, No. M2007-00404-CCA-R3-PC, 2008 WL 624926, at *8 (Tenn. Crim. App. Mar. 4, 2008). This court noted, however, that the post-conviction court accredited the testimony of trial counsel, finding that the petitioner never asked for an interpreter. *Id.* This court held that Petitioner "exhibited a fairly good grasp of English grammar and word order," affirming the denial of post-conviction relief on this basis. *Id.*

Petitioner filed his first petition for writ of error coram nobis, arguing that because of cultural differences between Korea and the United States, he did not know the true age of the victim. *Young Bok Song v. State*, No. M2009-02322-CCA-R3-CO, 2010 WL 4296673, at *7 (Tenn. Crim. App. Oct. 29, 2010). He contended that "evidence about the victim's age was 'newly discovered' because he had a limited understanding of English and was deprived of representation by a Korean consular and/or an interpreter." *Id.* at *8. This court affirmed the dismissal of Petitioner's first petition for writ of error coram nobis, noting that this court had already held that trial counsel was not ineffective for failing to retain an interpreter. *Id.*

Petitioner then filed a petition for habeas corpus relief, arguing that his convictions were void because "he was denied the opportunity to contact the Korean Consulate General in violation of Article 36 of the Vienna Treaty." *Young Bok Song v. Carlton*, No. E2009-01299-CCA-R3-HC, 2011 WL 900059, at *1 (Tenn. Crim. App. Mar. 16, 2011). This court affirmed the dismissal, holding that "[P]etitioner's allegations of a violation of the Vienna Treaty are not cognizable claims under the habeas corpus statutes of the State of Tennessee." *Id.* at *2.

Petitioner filed a second writ of error coram nobis, arguing that he "was: (1) being illegally restrained as a result of actions by the criminal court; (2) that trial counsel was ineffective . . . at trial and on appeal; and (3) that his case should be considered by 'the Presidential Speech,' public concern, and . . . the International Court of Justice." *Young Bok Song v. State*, No. M2010-02054-CCA-R3-CO, 2011 WL 2713738, at *1 (Tenn. Crim. App. July 13, 2011). This court affirmed the denial of Petitioner's second petition for writ of error coram nobis, holding that the coram nobis court did not abuse its discretion. *Id.* at *3.

On September 11, 2015, Petitioner filed the present petition for writ of error coram nobis, arguing that newly discovered evidence regarding his lack of proficiency in English would have resulted in a different jury verdict. He argued that a newly obtained expert had evaluated his proficiency with the English language and identified several issues involving his ability to understand and communicate in English. The expert found that Petitioner's "ability to formulate utterances in English was weak during the trial due to the imbalance of turns, his lack of vocabulary, omitted prepositions, and his use of hedges, and the interpretations of tags." The expert concluded that

> The language evaluation shows that [Petitioner] does not possess decisional competence in English due to his low cultural literacy. He does not have the basic American cultural knowledge required to be able to judge [the] nature and consequences of his acts, or the linguistics ability to express rational reasons. He is unable to use logical processes in English.

The coram nobis court summarily dismissed the petition, finding that the petition was filed outside the statute of limitations and that due process did not require tolling of the limitations period because the linguistics expert's findings did not constitute "evidence of innocence" or "newly discovered evidence." The coram nobis court also found that Petitioner "effectively communicated to the jury and the appointment of an interpreter would not have led to a different result."

## II.    Analysis

Petitioner alleges that the coram nobis court erred in dismissing his petition for writ of error coram nobis without a hearing. A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *State v. Workman*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding." T.C.A. § 40-26-105(b). Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The Supreme Court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* at 527-28.

"[A] petition for writ of error coram nobis must be dismissed as untimely unless it is filed within one year of the date on which the judgment of conviction became final in the trial court." *Mixon*, 983 S.W.2d at 670; T.C.A. § 27-7-103. The only exception to this is when due process requires a tolling of the statute of limitations. *Workman*, 41 S.W.3d at 103.

"Although coram nobis claims are also governed by a one-year statute of limitations, the State bears the burden of raising the bar of the statute of limitations as an affirmative defense." *Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). This Court has stated that "the statute of limitations is an affirmative defense which must be specifically plead or is deemed waived." *Newsome v. State*, 995 S.W.2d 129, 133 n. 5 (Tenn. Crim. App. 1998).

In this case, the petition for writ of error coram nobis was filed outside the limitations period. Petitioner argues that the State waived the statute of limitations defense because it did not raise it as an affirmative defense. The State, however, is not deemed to have waived the defense, if the petitioner "'is given fair notice of the defense and an opportunity to rebut it' because 'the purpose of the specific pleading requirement is to prevent a party from raising a defense at the last possible moment and thereby prejudicing the opposing party's opportunity to rebut the defense.'" *Wilson v. State*, 367 S.W.3d 229, 234 (Tenn. 2012) (quoting *Sands v. State*, 903 S.W.2d 297, 299 (Tenn. 1995). Here, Petitioner was given notice that his petition may be barred by the statute of limitations because he specifically addressed the late filing of the petition in his petition for writ of error coram nobis. *Howard Hawk Willis v. State*, No. E2015-00235-CCA-R3-ECN, 2016 WL 3753738, at *10 (Tenn. Crim. App. July 7, 2016). We hold that the State did not waive the statute of limitations defense. *See Wilson*, 367 S.W.3d at 234.

Although Petitioner filed this writ shortly after the expert issued her report, the writ was filed approximately ten years after the limitations period had run. Petitioner

argues that due process requires tolling of the limitations period because if evidence of his lack of proficiency had been presented at trial, then he would have been appointed an interpreter and, thus, the jury would not have convicted him. The expert's findings, however, only stated that Petitioner struggled with English grammar and that his proficiency may have affected the jury's perception of his testimony and credibility. Petitioner does not argue that his "newly discovered evidence" would have materially or substantively altered his trial testimony. The coram nobis court found in its denial that Petitioner "understood [English] and was able to effectively communicate to the jury." As this court held on direct appeal, "a review of [Petitioner's] testimony reveals that he speaks English quite well and, we believe, was able to effectively communicate with the jury." *See State v. Young Bok Song, a/k/a Mike*, 2005 WL 2978972, at \*7. Accordingly, we hold that due process does not require tolling because the linguistics expert's findings do not tend to show that a different verdict may have resulted if the Petitioner had testified with the assistance of an interpreter. Further, Petitioner's ability to speak English has been previously litigated on direct appeal and post-conviction relief, and each time this court held that Petitioner's English skills were sufficient not to require an interpreter.

## CONCLUSION

After a thorough review, we affirm the judgment of the coram nobis court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE